RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0235p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

**16-2761**

BARBARA BAYS and JEFFREY BAYS, as Co-Personal Representatives of the Estate of Shane Bays, Deceased,

        *Plaintiffs-Appellees*,

    *v.*

MONTMORENCY COUNTY, MICH., et al.,

        *Defendants*,

DONNA SIGLER, R.N.,

        *Defendant-Appellant*.

Nos. 16-2761/17-1215

**17-1215**

BARBARA BAYS and JEFFREY BAYS, as Co-Personal Representatives of the Estate of Shane Bays, Deceased,

        *Plaintiffs-Appellants*,

    *v.*

MONTMORENCY COUNTY, MICH., et al.,

        *Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-10534—Robert H. Cleland, District Judge.

Argued: October 3, 2017

Decided and Filed: October 20, 2017

Before: CLAY, ROGERS, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellant in 16-2761 and Appellees in 17-1215. Matt L. Turner,

SOMMERS SCHWARTZ, P.C., Southfield, Michigan, for Appellees in 16-2761 and Appellants in 17-1215. **ON BRIEF:** Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellant in 16-2761 and Appellees in 17-1215. Matt L. Turner, Ramona C. Howard, SOMMERS SCHWARTZ, P.C., Southfield, Michigan, for Appellees in 16-2761 and Appellants in 17-1215.

-------------------

**OPINION**

-------------------

SUTTON, Circuit Judge.   In the spring of 2013, Shane Bays walked into the Montmorency County Jail to await trial for driving a car with a suspended license. While there, he described symptoms of a mental illness to Donna Sigler, the jail nurse. Several weeks after arriving, he killed himself. In response, Shane's parents filed this § 1983 action against Sigler and Montmorency County. The district court denied summary judgment to Sigler but granted it to the County. Sigler appealed and the Bays cross-appealed. Because a triable issue of fact remains over whether Sigler violated Shane's clearly established Fourteenth Amendment right to sufficient treatment for a serious medical problem, we affirm the district court's qualified-immunity ruling. Because the Bays' cross-appeal of the summary judgment decision in favor of the County is not inextricably intertwined with Sigler's appeal, we dismiss it.

I.

As this case comes to us, the government defendants are required to accept these facts as true. On March 28, 2013, the Montmorency County Sheriff's Department arrested Bays, then 28 years old, for driving with a suspended license. He was placed in the Montmorency County Jail. On April 9, jail nurse Donna Sigler interviewed Shane as part of the jail's inmate health screening policy. During his interview, Shane complained of a host of psychological ailments. He reported that he was "bipolar," "paranoid," "angry," and that he suffered from "panic attack[s]" and had a history of substance abuse. Sigler wrote that she needed to follow up with a mental health evaluation. On the portion of the form asking whether Shane needed a referral for "emergency treatment, which may include Mental Health," she circled "YES" and wrote "on discharge." She returned Shane to the general prison population.

Later that day, Shane requested another meeting because he was "becoming a personal disaster." Sigler interviewed him again. She wrote that Shane described himself as anxious, paranoid, tense, unable to sleep, and experiencing "severe rage." They discussed his mental health and his request for treatment at a mental health center.

At some point that day, Sigler telephoned Amy Pilarski, a registered nurse specializing in mental health issues who worked with several Michigan jails. Sigler mentioned that Shane was "having some issues with anxiety." Pilarski recommended Benadryl and a follow-up appointment.

On April 11, Sigler scheduled Shane for an appointment on May 2. Though the mental health center offered an earlier appointment, she turned it down because a deputy would be on vacation during the offered time and "transporting [Shane] would be more difficult" than usual. That same day she recorded in her medical notes that Shane "denies suicide at this time."

Shane remained in the jail's general population area. On April 17, he requested another meeting with Sigler. She noted that he was more relaxed and less anxious than he had been the week before. By Friday, April 19, his condition had deteriorated. He again reported anxiety, agitation, paranoia, and troubling thoughts. He also reported that he was afraid he would hurt others and that he had scraped his hands punching the wall. Sigler again noted that Shane denied being suicidal. Hoping to schedule an earlier appointment, Sigler made two calls to Pilarski but could not reach her. Sigler left a message asking Pilarski to call her should any cancellations free up an earlier appointment.

Shane hanged himself in the jail showers sometime between 11:00 PM on April 22 and 1:30 AM on April 23. *Bays v. Montmorency Cty.*, No. 15-10534, 2016 WL 1728569 (E.D. Mich. May 2, 2016).

Shane's parents Barbara and Jeffrey filed a § 1983 action, claiming that Sigler violated Shane's right to receive care for a serious medical need and that the County failed to train its personnel to provide proper health care to its inmates. Both sides moved for summary judgment. The district court denied the Bays' motion and granted summary judgment to the County. Sigler

filed an interlocutory appeal challenging the denial of qualified immunity. The Bays filed a cross-appeal as to their claim against the County.

II.

*Sigler's appeal.* In a qualified-immunity case, we ask two questions: Did the officer violate the injured party's constitutional rights? If so, was the right clearly established at the time? *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In considering these questions, we assume the truth of all record-supported allegations by the non-movant, here the Bays. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2017 (2014).

Prison officials violate the Eighth Amendment when they act with "deliberate indifference" to the "serious medical needs" of inmates committed to their charge. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). The Due Process Clause of the Fourteenth Amendment provides the same guarantee to pretrial detainees. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243–44 (1983). Two inquiries loom over every deliberate indifference case: Was the ailment a serious one? And was the official "subjective[ly] reckless[]," such that she was actually "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also [drew] the inference"? *Farmer v. Brennan*, 511 U.S. 825, 837–40 (1994); *see Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006).

Shane's mental illness was objectively serious, for starters. Throughout his incarceration, Shane described severe psychological symptoms to Sigler: paranoia, anxiety, anger, troubling thoughts, self-destructive wall-punching, the hearing of voices, and violent impulses directed towards other inmates. He did so repeatedly, in ever more strident language, up until the Friday before he took his own life. These facts would permit a jury to conclude that a reasonable nurse would recognize that Shane needed prompt medical help. *See Harris v. City of Circleville*, 583 F.3d 356, 368 (6th Cir. 2009).

In addition, Sigler subjectively understood Shane's plight. Sigler was a trained medical professional. Her actions, notes, and words suggest that she recognized Shane's distress. She interviewed Shane when he arrived on April 9 and recorded his litany of symptoms. In a portion of the form asking whether Shane should be referred "to appropriate health care service for

emergency treatment, which may include Mental Health," she circled "YES." She responded to two requests for treatment that Shane made after his initial interview. She was concerned enough to check whether Shane was thinking about hurting himself on April 11 and April 19. She later admitted that she thought the prison should have added Shane to a watch list for his own safety. And she repeatedly tried to expedite his mental health appointment because "the inmate need[ed] to be seen." These facts taken together would permit a jury to conclude that Sigler subjectively thought there was a "risk of serious harm." *Farmer*, 511 U.S. at 837.

Other evidence shows that Sigler disregarded that risk in a way that goes beyond negligence. *See id.* at 835–37. When she spoke with Nurse Pilarski, her primary point of contact for psychiatric questions, she knew that Shane thought he had bipolar disorder and suffered from severe psychiatric symptoms. Yet she failed to tell Pilarski about any symptom other than anxiety, causing Pilarski to misdiagnose Shane's illness and prescribe only a dose of Benadryl. After treating Shane for several days, she realized that she needed to reschedule his psychological treatment for an earlier date. Yet she passed on an earlier appointment because the absence of a prison guard would have made moving Shane "difficult," then chose not to use the emergency resources at her disposal before she left for the weekend. When she considered his condition as of mid-April, she believed he needed to be placed on a special watch list. Yet she did not arrange for him to be added to one.

Sigler admitted in her deposition that the care she provided fell short of what Shane needed:

> [ATTORNEY]: So as of April 19th with just about two weeks before his appointment do you acknowledge that [Shane] needed to be seen sooner?
> [SIGLER]: Yes.
> [ATTORNEY]: But you were not able to get him in sooner because you did not get ahold of Amy [Pilarski] at [the mental health clinic]?
> [SIGLER]: Correct.
> [ATTORNEY]: Why didn't you call an ambulance?
> [SIGLER]: I don't know.
> [ATTORNEY]: Could you have?
> [SIGLER]: Yes.
> [ATTORNEY]: Should you have?
> [SIGLER]: Yes.

R. 49-6 at 20–21.  A jury could reasonably conclude that Sigler deliberately disregarded Shane's serious medical need.

This constitutional right also was clearly established.  The Supreme Court has long recognized that inmates have the right to reasonable medical care under the Eighth and Fourteenth Amendment.  *See Estelle*, 429 U.S. at 103–04.  And several circuits, including this one, have held that the right extends to psychological treatment for serious mental illnesses. *See Clark-Murphy*, 439 F.3d at 292 (listing cases).

Sigler's counterarguments are unconvincing.  She argues that the evidence does not establish that Shane suffered from a serious medical condition, noting that no physician diagnosed Shane and that he did not face "any substantial or immediate risk of harm" that would prompt a layman to seek help.  Appellant's Br. at 21.  The former is true but not dispositive.  The latter is wrong.  The record describes a paranoid, angry, depressed, self-destructive, and potentially violent man desperately asking for help.  Any reasonable nurse would have known to look for medical help.  *See Clark-Murphy*, 439 F.3d at 290–91.

Sigler adds that nothing in the record shows that she subjectively knew, then disregarded, that Shane was at risk of suicide.  But the relevant question is not whether Sigler recognized that Shane might kill himself.  It is whether Sigler recognized that Shane was suffering from a serious mental illness creating a host of risks and requiring immediate treatment during the fourteen days that Sigler treated him.  *Blackmore v. Kalamazoo Cty.*, 390 F.3d 809, 899 (6th Cir. 2004).

Sigler argues that while she may have committed malpractice, her conduct was not deliberately indifferent to Shane's plight.  If a prison medical official provides treatment, it is true, constitutional liability attaches only if the treatment is "so cursory as to amount to a conscious disregard for [the inmate's] needs."  *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014).  Taking the Bays' allegations as true, Sigler's care fell below this admittedly low bar.  She scheduled an appointment weeks in the future despite symptoms that she, Nurse Pilarski, and the Bays' expert now all agree required immediate or near-immediate care.

Yes, she eventually did try to schedule an earlier appointment. But the sum total of her efforts were two phone calls and a message, all while she had the option of getting immediate emergency room treatment or at least putting him on a watch list, and yet she chose to do neither.

Sigler looks to *Taylor v. Burkes*, which held that inmates have no clearly established right to the proper implementation of suicide prevention procedures. 135 S. Ct. 2042, 2044 (2015). But the Bays do not argue that Sigler violated Shane's right to procedures that might have prevented his suicide. They argue that Sigler violated Shane's right to have a serious psychological illness treated seriously. And that right is clearly established. *See Clark-Murphy*, 439 F.3d at 292.

A comparison illustrates the pitfalls of Sigler's position. In *Blackmore v. Kalamazoo County*, an inmate suffered a burst appendix. County officials were deliberately indifferent to this severe physical ailment and delayed his treatment. Though he survived the illness and made a full recovery, we found that the severe pain he endured during the delay could entitle him to damages under § 1983. *Blackmore*, 390 F.3d at 900. The same is true for Shane. Defendants must accept at this stage the Bays' fact-based allegations that he suffered severe psychological pain in the weeks leading up to his suicide and had a clearly established right to treatment for that serious medical need that Sigler failed to provide. Shane's parents deserve the same chance to take their case to a jury.

III.

*The Bays' cross-appeal.* In challenging the district court's decision dismissing their failure-to-train claim against Montmorency County, the Bays face a narrow path. A ruling that disposes of one party or claim typically is not considered an appealable "final" decision. 28 U.S.C. § 1291; *see Flanagan v. United States*, 465 U.S. 259, 263 (1984). Unlike Sigler, the Bays have no stand-alone right to an interlocutory appeal of the district court's grant of summary judgment in favor of the County. *See Floyd v. City of Detroit*, 518 F.3d 398, 410 (6th Cir. 2008). And while the Bays might have asked the district court to enter final judgment with respect to this claim, they did not do so. *See* Civil Rule 54(b).

Even so, the Bays claim that we should rely on our pendent appellate jurisdiction to consider their cross-appeal in connection with Sigler's appeal of the district court's denial of qualified immunity. To do that, we must find that the failure-to-train claim is "inextricably intertwined" with the qualified immunity claim. A claim is "inextricably intertwined" if it is "coterminous with, or subsumed in" the claim on collateral appeal such that "appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *Mattox v. City of Forest Park*, 183 F.3d 515, 524 (6th Cir. 1999) (quotations omitted); *see Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 51 (1995).

Given our rejection of Nurse Sigler's appeal, the Bays' failure-to-train claim does not meet this test. Our decision to affirm the district court's denial of qualified immunity does not necessarily decide the question whether the district court erred in granting summary judgment to the County on the failure-to-train claim. That the Bays have a cognizable claim against Sigler by no means shows that they have a cognizable claim against the County. That Sigler may have shown deliberate indifference to Shane's medical needs does not show that the County failed to train its employees in this area or had a policy designed to violate such rights. *See Hidden Village, LLC v. City of Lakewood*, 734 F.3d 519, 524 (6th Cir. 2013); *see also, e.g., Hudson v. Hall*, 231 F.3d 1289, 1292 n.1 (11th Cir. 2000).

*Mattox v. City of Forest Park* does not change our minds. 183 F.3d 515 (6th Cir. 1999). The district court in that case denied the officer and the city summary judgment in a § 1983 suit. We overturned the district court's summary judgment against the officer after finding that he had not violated any constitutional right and thus deserved qualified immunity. *Id.* at 517. Because a municipality cannot be held liable if none of its officers violated a constitutional right, our qualified immunity decision necessarily subverted the district court's summary judgment against the city. That meant the city's appeal was inextricably intertwined with the qualified immunity appeal, which in turn meant we could exercise pendent jurisdiction over it. *Id.* at 523–24.

The Bays' claim differs materially. Our review of Sigler's qualified-immunity claim does not necessarily decide whether the Bays produced enough evidence to save their claim against the County. It could be that the district court correctly held that the Bays failed to carry

their burden.  Or it could be that the district court erred and the County is liable.  The question remains open for appeal after the district court renders final judgment in the case.

For these reasons, we affirm the district court's denial of qualified immunity to Donna Sigler and dismiss the Bays' appeal for lack of jurisdiction.