NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 19a0195n.06

Case No. 18-1604

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>ANITA PATRICIA BAKER-SCHNEIDER,<br>as Personal Representative of the Estate of<br>Michael Edward Schneider,<br>     Plaintiff-Appellee,<br><br>v.<br><br>BENNY N. NAPOLEON, et al.,<br>     Defendants,<br><br>NAYEEM HUQ and FARHAN HUQ, as<br>Personal Representatives of the Estate of<br>Rubab Huq,<br>     Defendants-Appellants.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>FILED<br>Apr 16, 2019<br>DEBORAH S. HUNT, Clerk<br><br>ON APPEAL FROM THE UNITED<br>STATES DISTRICT COURT FOR<br>THE EASTERN DISTRICT OF<br>MICHIGAN<br><br>OPINION</td></tr>
</table>

BEFORE: BATCHELDER, McKEAGUE, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. After Michael Schneider committed suicide at a Michigan jail while he was awaiting a pretrial hearing, his personal representative, Anita Patricia Baker-Schneider, sued several jail officials and government entities under federal and Michigan law. This appeal involves only one of those defendants, Rubab Huq, M.D., the on-duty physician who examined Schneider when he arrived at the jail.[1] The crux of this appeal is whether Huq acted with deliberate indifference to Schneider's psychological needs by releasing Schneider into the general jail population without first treating Schneider's mental illness. Because the record contains no evidence that Schneider disclosed his underlying mental illness to Huq—much less

---

[1] Huq died while this appeal was pending. Baker-Schneider filed a motion to substitute Huq's personal representatives, Nayeem Huq and Farhan Huq, in place of Huq, which this court granted.

that he expressed suicidal thoughts to Huq—we conclude that Huq did not act with deliberate indifference in violation of Schneider's constitutional rights. Thus, we REVERSE the district court's denial of qualified immunity to Huq.

## I.

On November 6, 2014, a state court judge arraigned Michael Schneider on a misdemeanor domestic violence charge and ordered him held without bond until his November 18, 2014, pretrial hearing. The following morning, police officers transported Schneider to Wayne County, Michigan's William Dickerson Detention Facility ("Dickerson"). Shortly after his arrival, Schneider met with several medical professionals, beginning with medical assistant Cathryn Storey. Storey asked Schneider a series of questions about his medical history, medications, and drug and alcohol use and then uploaded Schneider's answers to an online intake form. By his own account, Schneider was in poor physical health: he informed Storey that he had diabetes and Hepatitis C and had recently fractured a rib, causing chest pain and shortness of breath. A regular heroin user, Schneider also reported diarrhea and hearing voices—both symptoms of withdrawal.

Schneider also described his mental health conditions, including bipolar disorder—for which he was taking prescription medication—and a history of self-cutting. Indeed, Schneider acknowledged that he had attempted suicide, although further details about that attempt, including the date, are unknown. Schneider denied having present thoughts of suicide, and Storey noted that Schneider was not crying or acting in a strange or unusual manner and showed no signs of anxiety, depression, or shame. But Storey noticed that Schneider had cuts on both of his hands, and Schneider acknowledged that the injuries were self-inflicted. So Storey referred Schneider to a psychiatrist for a follow-up examination at a later date.

Around noon, Schneider visited Dickerson's medical clinic and met with registered nurse Mildred Neal, who collected additional information from Schneider. In her examination notes, Neal wrote that Schneider had suffered from hypertension for more than twenty years and had also been diagnosed with prostate cancer. Schneider told Neal that he was taking Hydrocodone for back pain but that he did not recall the names of his other medications or the name of his pharmacy. After testing Schneider's blood sugar levels, Neal sent Schneider to the medical doctor on duty in the clinic, Defendant-Appellant Rubab Huq, M.D.

Huq began the examination just after 1:30 p.m. by palpating Schneider's ribcage. Although Schneider did not report pain, Huq still ordered a chest x-ray. Huq collected still more medical history from Schneider, including that he had undergone a prostatectomy two years earlier. She also noted that Schneider was crying off and on during her examination and that Schneider complained of diarrhea and skin crawling. Thus, Huq placed Schneider on a heroin withdrawal regimen, prescribing Catapres, Benadryl, and Imodium. Schneider received his first doses of those medicines that afternoon while he was in the clinic. And finally, Huq ordered regular blood sugar testing to monitor Schneider's diabetes.

Much of this appeal concerns Huq's knowledge of Schneider's underlying mental health conditions. Although Huq possessed Neal's assessment of Schneider as she conducted the examination, Huq had not yet read Schneider's responses to the questions that Storey asked from the intake form. In her deposition testimony, Huq stated that because she examined Schneider soon after he arrived at Dickerson and met with Storey, she did not have the intake form in front of her during the examination, as is normally the case. Huq conceded, however, that she could have accessed the intake form electronically because Storey recorded Schneider's answers online contemporaneously.

3

In any event, Huq testified that she did not know about Schneider's mental health conditions, including that he had been psychiatrically hospitalized, took psychiatric medication, and had attempted suicide. According to Huq, Schneider said "[n]othing whatsoever" about any mental health issues. (R. 40-4, Huq Dep. at 27:17.) That is not to say that Huq skirted over the issue during her examination of Schneider: Huq insisted that she followed protocol by asking Schneider about his mental health but that Schneider "did not voice anything," (*Id.* at 34:4), and that "[n]othing remotely made me think that this guy has issues with mental health . . . ." (*Id.* at 34:1-2.) And Huq testified that even if she had reviewed Schneider's responses to the intake form, she would not have treated Schneider differently.

With his medical screening complete, Schneider entered the general jail population. The next morning, he visited the medical clinic, where nurse Brenda Williams tested his blood sugar levels. Although Williams stated in an affidavit that she had no independent recollection of Schneider's visit, she consulted her records and found no indication that Schneider mentioned suicide. Williams remarked that she "would have documented [such information] in the record and immediately contacted the charge nurse for a mental health referral" had Schneider expressed suicidal thoughts. (R. 32-13, Williams Aff. at 2.)

Around 1:00 p.m. on November 8—about twenty-four hours after Huq's examination of Schneider—a jail guard passed the shower unit and observed someone sitting behind the door of the shower but without the water running. This prompted the guard to open the shower door, where he found Schneider hanging from a sheet. With assistance from two inmates, the guard removed the sheet from Schneider's neck and began to resuscitate him. Paramedics soon arrived and transported Schneider to Detroit Receiving Hospital, but he died three days later.

Anita Patricia Baker-Schneider, who represents Schneider's estate, alleges a mix of claims under 42 U.S.C. § 1983 and Michigan law against Huq, several other jail officials, Wayne County, Michigan, and the Wayne County Sheriff's Department. The district court granted the defendants' motion for summary judgment on all claims as to all defendants, except for the § 1983 claim against Huq. The court denied Huq's qualified immunity defense, holding that a factual dispute remained on whether Huq violated Schneider's constitutional rights. Huq has appealed that decision.

## II.

We first address our jurisdiction to hear this case. The denial of a motion for summary judgment is ordinarily not appealable because that decision "presents neither a final appealable order nor an appealable interlocutory order." *Floyd v. City of Detroit*, 518 F.3d 398, 404 (6th Cir. 2008) (citation omitted). But there is an exception to that rule in the qualified immunity context. We have jurisdiction to hear an appeal when a district court denies qualified immunity if the appeal "presents a question of law and does not require us to resolve disputes of material facts." *Jefferson v. Lewis*, 594 F.3d 454, 459 (6th Cir. 2010) (citation omitted). Here, both parties have stipulated to the district court's factual findings, leaving only questions of law for this court to resolve. Accordingly, we exercise our jurisdiction to hear this appeal, and we review the district court's legal conclusions de novo. *Brown v. Chapman*, 814 F.3d 447, 464 (6th Cir. 2016).

## III.

Because Huq has asserted qualified immunity as a defense, we must resolve two questions: (1) did she violate Schneider's constitutional rights; and (2) if so, was the constitutional right clearly established when the violation occurred? *Bays v. Montmorency Cty.*, 874 F.3d 264, 268 (6th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

To answer the first question, we must determine what rights a pretrial detainee possesses—and whether Huq violated those rights. The Supreme Court has held that a prison official violates the Eighth Amendment when he acts with "deliberate indifference" to an inmate's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Of course, Schneider was a pretrial detainee, not a prisoner, but that distinction is immaterial here because the Fourteenth Amendment's Due Process Clause extends the same protections to pretrial detainees as the Eighth Amendment does to prisoners. *Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016).

A claim of deliberate indifference under the Eighth Amendment has two components—one objective, the other subjective. *Broughton v. Premier Health Care Servs., Inc.*, 656 F. App'x 54, 56 (6th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Under the objective component, the plaintiff must "allege that the medical need at issue is 'sufficiently serious.'" *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834). The parties do not dispute that element of the claim, and we have repeatedly held that a prisoner's psychological needs are sufficiently serious, especially when the prisoner is suicidal. *See, e.g.*, *Comstock*, 273 F.3d at 703–04; *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994). Instead, this appeal turns on the subjective component: here, whether Huq "subjectively perceived facts from which to infer substantial risk to [Schneider], that [she] did in fact draw that inference, and that [she] then disregarded that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837). Mere negligence does not rise to the level of a constitutional violation. *Comstock*, 273 F.3d at 703. Instead, the plaintiff must show that the prison official *recklessly* disregarded a known risk. *Id.*

The core of Baker-Schneider's argument is threefold: (1) Huq directly examined Schneider; (2) Huq ignored Schneider's significant psychological needs, including his heightened

6

risk of suicide; and (3) Huq released Schneider into the general inmate population. Baker-Schneider argues that before releasing Schneider, Huq could have placed him in a secure environment with greater safeguards against inmate suicide, warned jail guards about his condition, or referred him to a psychiatrist for immediate treatment.

The district court denied Huq's qualified immunity defense because "reasonable minds could differ as to whether Huq's failure to review [Schneider's responses to the intake form] amounted to deliberate indifference," noting that "it is a jury question as to whether Huq recklessly disregarded available information evidencing Schneider's risk of suicide." (R. 41, Order at 23.) But that holding, if applied broadly, would treat medical malpractice as a constitutional tort. That cannot be. *See, e.g.*, *Comstock*, 273 F.3d at 703. Huq's liability does not hinge on whether she should have logged onto her computer to review Schneider's responses to the intake form. Rather, our inquiry considers Huq's actions given the knowledge *she* possessed when she examined Schneider. Indeed, this is "not an objective test or [based on] collective knowledge." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (internal quotation marks omitted). We must determine "whether [Huq] recognized that [Schneider] was suffering from a serious mental illness creating a host of risks and requiring immediate treatment . . . ." *Bays*, 874 F.3d at 269 (citing *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004)).

At the outset, we note that when a prison official renders medical treatment, constitutional liability attaches "only if the treatment is 'so cursory as to amount to a conscious disregard for [the inmate's] needs.'" *Bays*, 874 F.3d at 269 (quoting *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014)) (alterations in original). And in cases of suicide, the bar for establishing liability is even higher. Because suicide is a "difficult event to predict and prevent and often occurs without warning," it cannot be the case that a prison doctor is liable any time an inmate under his care

commits suicide. *Gray,* 399 F.3d at 616. Instead, liability attaches only when the decedent "showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs." *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992). Here, the record shows that Huq rendered medical care. Indeed, she palpated Schneider's ribs, ordered a chest x-ray and routine blood sugar testing, and placed Schneider on a medication regimen to lessen his heroin withdrawal symptoms. The question, then, is whether Schneider showed to Huq a strong likelihood that he would commit suicide—and whether Huq recklessly disregarded that risk.

The record contains no evidence to suggest that Huq knew of Schneider's poor mental condition—much less that Huq recognized that he was suicidal and consciously disregarded his condition. To the contrary, Huq testified that she asked about Schneider's mental health and that Schneider said "[n]othing whatsoever" suggesting that he was suicidal or otherwise suffering from mental illness. Nor did Schneider confide in Huq about his prior suicide attempts, bipolar disorder diagnosis, use of medication to treat his bipolar disorder, or history of self-harm. The only evidence that could have possibly alerted Huq to Schneider's condition was the fact that Schneider cried intermittently during the examination. But that fact alone does not suggest a "strong likelihood" that Schneider would later commit suicide, particularly when placed in context: Schneider knew that he would have to spend the next eleven days in jail before his pretrial hearing, and worse yet, he was withdrawing from heroin, which he had used daily.

Baker-Schneider argues that *Bays* supports affirming the district court's decision, but we find that comparison inapt. There, the inmate repeatedly sought medical attention from the jail nurse, described himself as "bipolar," "paranoid," and "angry," and later warned that he was "becoming a personal disaster." *Bays*, 874 F.3d at 267. The jail nurse scheduled Bays for an

appointment at a mental health center some three weeks later, turning down the center's offer of an earlier appointment because "a deputy would be on vacation during the offered time and transporting [Bays] would be more difficult than usual." *Id.* (internal quotation marks and alterations omitted). Meanwhile, Bays's condition continued to deteriorate—which he reported to jail officials—and he ultimately hanged himself without ever receiving psychiatric treatment. *Id.* While both Bays and Schneider committed suicide as they awaited their next court date, the similarities between the cases end there. Bays fully disclosed his mental illness to medical professionals at the jail—and, indeed, repeatedly sought treatment—yet Schneider neither disclosed his history of mental illness to Huq nor requested assistance from Huq.

Baker-Schneider also alleges that Huq sought to "remain blissfully ignorant" to Schneider's mental health. (Appellee Br. at 25.) But this argument is similarly unavailing. For one, Huq attests that she examined Schneider and asked him about his mental health, undermining the assertion that Huq deliberately ignored Schneider's condition. And the cases Baker-Schneider cites on this point—all from outside this circuit—do not advance her argument. In *Leavitt v. Correctional Medical Services, Inc.*, for example, the First Circuit overturned the district court's conferral of qualified immunity to a physician assistant who treated an HIV-positive inmate. 645 F.3d 484 (1st Cir. 2011). There, the inmate disclosed his medical history and requested antiviral medications to prevent the progression of his condition. *Id.* at 489. In turn, the physician assistant ordered a battery of blood tests to best determine which antiviral medication to prescribe—but then never reviewed those tests nor followed up with the inmate. *Id.* at 490. But that case ultimately turned on a factual dispute over whether the physician assistant told the inmate that the jail lacked the financial resources to pay for antiviral medication, even if the inmate needed that medication. The First Circuit noted that the district court was "too quick to decide that [the

physician assistant's] version was credible and [the inmate's] not," and that the "genuine and material dispute ought to be resolved by a jury." *Id.* at 499–500. By contrast, we need not make credibility determinations to conclude here that Huq did not violate Schneider's constitutional rights.

Because the record contains no evidence that Schneider showed before Huq a strong likelihood that he would commit suicide, nor evidence that Huq disregarded that risk, we conclude as a matter of law that Huq is entitled to qualified immunity.

**IV.**

We REVERSE the district court's denial of qualified immunity as to Rubab Huq, M.D.