NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0031n.06

No. 23-5117

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| WILLIAM CHRISTOPHER YARBROUGH, | ) | **FILED** |
| Plaintiff-Appellee, | ) | Jan 22, 2024 |
| | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | |
| | ) | |
| HENDERSON COUNTY, TENNESSEE, et al., | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Defendants, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| JACKIE BAUSMAN; GARY SIMPSON; AUSTIN | ) | |
| OWEN; WENDI EITLEMAN; CORDERO | ) | OPINION |
| STATEN; TAYLOR STEGALL; KRISTI | ) | |
| COTTON; JESSILYN MARSHALL, | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

Before: BATCHELDER, GRIFFIN, and BLOOMEKATZ, Circuit Judges.

GRIFFIN, Circuit Judge.

After his family called the police in the midst of his mental-health crisis, William Yarbrough was arrested, placed on a "psych hold," and taken to the Henderson County jail. While there, he hallucinated and repeatedly harmed himself by running headfirst into his cell door. Despite Yarbrough's behavior, none of the eight corrections officers who interacted with him called the jail's mental-health provider.

In this action, Yarbrough alleges that the officers were deliberately indifferent to his physical and mental-health needs in violation of the Fourteenth Amendment. The district court granted summary judgment in the officers' favor regarding Yarbrough's physical-health claims,

but denied summary judgment regarding his mental-health claims. The officers appeal. We affirm the judgment of the district court.

## I.

Yarbrough's mental-health crisis began on April 28, 2020—he stopped sleeping, began hallucinating, and barely ate for more than two weeks. So, on May 15, his mother contacted Lakeside—a mental-health facility—and scheduled him for admission the next day. However, Yarbrough never made it to Lakeside. Instead, his behavior escalated after he no longer recognized his father. His family called police, who eventually arrested him for assaulting his father and resisting arrest. The responding officers placed Yarbrough on a "psych hold" and transported him to the Henderson County jail.

On the way to the jail, the responding officers called the jail, reporting that Yarbrough "was combative and needed to be placed in a restraint chair." Upon arrival, Yarbrough immediately attempted to flee and ran into a closed door, prompting officers Gary Simpson, Austin Owen, and two nonparty officers to detain him and place him in a restraint chair at 10:03 p.m.

Once restrained, Yarbrough was brought to the booking area so "he could be monitored and clearly observed." Simpson then attempted to complete the booking process, but he was unable to do so because Yarbrough could not answer his questions. In the next few hours, Yarbrough broke a leg restraint, attempted to hurt himself, and talked to himself. He was removed from the restraint chair at 2:50 a.m. on May 16 and placed in an observation cell. When the shifts changed at 6:00 a.m., Wendi Eitleman took over for Simpson as the booking officer, and Simpson informed the incoming day-shift officers that Yarbrough was on a psych hold.

An hour and a half into Eitleman's shift, Yarbrough purposely hit his head on his cell door twice. He then believed he saw a local high school basketball coach—who was not actually

present—and asked Eitleman if he could speak with the coach. Soon after that, Yarbrough ran headfirst into his cell door at least fifteen times. In response, officers Eitleman, Kristi Cotton, Cordero Staten, and Taylor Stegall opened Yarbrough's cell door to restrain him, prompting him to attempt to run out of the cell. Cotton pepper-sprayed Yarbrough, and a violent confrontation ensued—Yarbrough bit Staten and one other officer. The officers eventually subdued Yarbrough and placed him back in the restraint chair at 7:40 a.m. to prevent him from further harming himself or others.

Nurse Jennifer Davis attempted to physically examine Yarbrough while he was in the restraint chair, but she could not do so because he thought her thermometer was a gun and that she was trying to hurt him. While in the restraint chair, Yarbrough apparently hallucinated and was often observed "yelling" and "screaming." According to the officers' observation log, he was last observed yelling "help me" at 12:48 p.m. He was removed from the restraint chair at 1:00 p.m.

At some point before 2:30 p.m. that day, Staten—who also happens to be Yarbrough's cousin—called Yarbrough's father and told him about Yarbrough's behavior. Yarbrough's father told Staten that Yarbrough "had been acting strangely and that [his family] had arranged to send [Yarbrough] to Lakeside prior to his arrest." Staten reported this conversation to Cotton and Nurse Davis around 2:30 p.m.

Around 6:00 p.m., the officers changed shifts again; Eitleman, Cotton, Staten, and Stegall were replaced, and Jessilyn Marshall took over for Eitleman as the booking officer. Soon after arriving and reviewing all documentation concerning Yarbrough's behavior at the jail, Marshall saw Yarbrough "hitting the door with his fist" at least ten times and "hit his head at least once." After Yarbrough calmed down, Marshall gave Yarbrough his dinner around 7:00 p.m., which he threw out of his cell. A few hours later, Marshall noticed that Yarbrough's wrist was swollen and

reported it to Jackie Bausman, her commanding officer. At that point, Bausman was already aware that Yarbrough was combative, violent, and had to be placed in a restraint chair due to his attempted self-harm. Bausman told Marshall to wait for medical staff to examine Yarbrough in the morning because she did not think it was safe for Marshall to enter Yarbrough's cell given his behavior. Throughout Marshall's shift, Yarbrough talked "nonsensical[ly]," "intermittently cried, yelled, and hit the door."

Shifts changed again at 6:00 a.m. on May 17. When Cotton arrived for her shift, she "observed some 'puffiness' around [Yarbrough's] collarbone," although she could not fully observe his collarbone because he was wearing a blanket. About one hour later, Nurse Davis noticed that Yarbrough's wrist was swollen, and learned from officers that Yarbrough had not slept and that he had hit his cell door with both arms while naked and yelling "you ate my kids." A few hours later, Yarbrough complained about his wrist, and medical staff concluded that he needed to be transported to the hospital for evaluation. While arrangements were being made to do so, Cotton removed the blanket and noticed Yarbrough's neck was "severely swollen."

Early that afternoon, Owen and Staten transported Yarbrough to Jackson-Madison County General Hospital. Yarbrough "was diagnosed with a subcutaneous emphysema," which "is a condition where air escapes the lung and fills up under the skin causing swelling." The hospital's records show that Yarbrough "present[ed] with psychiatric problems and agitation" and a differential diagnosis of "[s]chizophrenia . . . , hallucination, [and] psychosis." Yarbrough was placed in restraints while hospitalized; he was "agitated," "yelling," and "confused," and he did "not know how old he [was] or where he [was]." He was also intubated because of labored breathing and "subcutaneous air from behind his ears, his neck, chest, abdomen, [and] upper legs bilaterally."

Yarbrough was transferred to Vanderbilt University Medical Center the same day. He presented "with altered mental status" that began "apparently several weeks ago." Vanderbilt's records note that he had bipolar disorder with a "manic severe" episode "with psychotic features." As for his physical health, he was treated for "[a]cute respiratory failure with hypoxia," "[s]ubcutaneous air," "[t]raumatic pneumothorax," and "[b]lunt trauma." Yarbrough was discharged from Vanderbilt twelve days later.

In total, Yarbrough was at the jail from May 15 at 10:03 p.m. to May 17 at 1:15 p.m. While he was there, no one called Pathways—the jail's on-call mental-health provider—or took other steps to seek mental-health treatment for Yarbrough.

Yarbrough sued Henderson County, Davis, Bausman, Simpson, Owen, Eitleman, Staten, Stegall, Cotton, and Marshall, alleging they were deliberately indifferent to his serious physical- and mental-health needs when he was at the jail, in violation of 42 U.S.C. § 1983.[1] Defendants moved for summary judgment, asserting that they were not deliberately indifferent and thus entitled to qualified immunity. The district court agreed in part, granting summary judgment in favor of defendants on Yarbrough's physical-health claims but denying summary judgment regarding his mental-health claims. Defendants timely appeal.

II.

Before addressing the merits, we must ensure ourselves of our subject-matter jurisdiction. We have jurisdiction over an order denying qualified immunity only "to the extent that it turns on an issue of law." *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996). We do not have jurisdiction over

---

[1]Henderson County and Nurse Davis are not parties on appeal, so "defendants" refers to the individual defendant officers.

factual arguments brought in this procedural posture. *See Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998).

As a pretrial detainee. Yarbrough had a clearly established right to mental-health treatment. *See Greene v. Crawford Cnty.*, 22 F.4th 593, 607 (6th Cir. 2022); *Clark-Murphy v. Foreback*, 439 F.3d 280, 286–87 (6th Cir. 2006). The issue before us here is a legal one: whether Yarbough's behavior in the jail demonstrated that he had a serious need for such treatment and whether defendants acted deliberately or recklessly in the face of that need. *Helphestine v. Lewis Cnty.*, 60 F.4th 305, 317 (6th Cir. 2023). Defendants argue that they were not deliberately indifferent to Yarbrough's mental-health needs because they reasonably believed that he was intoxicated, not that he had mental-health issues. But Yarbrough does not dispute that the defendants were at no time able to distinguish between symptoms of intoxication and symptoms of a mental-health episode. Hence, the defendants' perception—or misperception—of the reason for Yarbrough's behavior is neither disputed, nor, more importantly, material to the issue, and does not divest us of jurisdiction.

III.

Turning to the merits, we review de novo the district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Yarbrough claims that defendants were deliberately indifferent to his serious mental-health needs in violation of his constitutional rights. "[P]retrial detainees have a constitutional right to be free from deliberate indifference to serious medical needs under the Due Process Clause of the Fourteenth Amendment." *Greene*, 22 F.4th at 605. To show that defendants were deliberately indifferent to his serious mental-health needs, Yarbrough "must show (1) that [he] had a sufficiently serious medical need and (2) that each defendant acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine*, 60 F.4th at 317 (internal quotation marks omitted) (second alteration in original). We can consider circumstantial evidence when addressing the subjective prong of the analysis. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

A.

Starting with the objective component of the test, defendants argue that Yarbrough's mental-health issues were not sufficiently serious because they "were unable to distinguish [his] mental issues from symptoms of intoxication." Appellant's Brief, p. 29. But as we have noted, defendants' perceptions of the reason for his behavior are immaterial, and defendants offer no other explanation for why the objective prong was not satisfied. Nor could they because the objective prong is easily met here.

"A sufficiently serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Griffith v. Franklin Cnty.*, 975 F.3d 554, 567 (6th Cir. 2020) (internal quotation marks omitted). Placing a pretrial detainee in an observation cell due to his medical condition "tends to show a sufficiently serious medical need." *Helphenstine*, 60 F.4th at 318. And "the deprivation of water and medical care, including psychological services, of course

would be sufficiently serious." *Clark-Murphy*, 439 F.3d at 286 (internal quotation marks omitted). Such needs can be established through suicidal tendencies, *Comstock*, 273 F.3d at 703, or serious self-harming behavior even if not suicidal, *Bays v. Montmorency Cnty.*, 874 F.3d 264, 268 (6th Cir. 2017) (concluding that severe psychological symptoms such as "troubling thoughts, self-destructive wall-punching, [and] the hearing of voices" are objectively serious, apart from the act of suicide).

The severity of Yarbrough's mental-health condition was obvious to his family, who called Lakeside and later the police for help. While at the jail, Yarbrough was placed on a psych hold, twice confined to a restraint chair because of violent and self-harming actions that caused plainly visible injuries, observed hallucinating and speaking nonsensically, and unable to answer simple questions when being booked. Such conduct plainly satisfies the objective prong. *See Bays*, 874 F.3d at 268.

## B.

That brings us to the subjective component of the deliberate-indifference test.

### 1.

Before analyzing each defendant's individual actions, we address a few preliminary issues relevant to this prong of the deliberate-indifference test.

*The nature of the harm.* The alleged unjustifiable risk asserted in Yarbrough's complaint was the risk of Yarbrough's inflicting physical self-harm. While uncommon, this theory of liability is clearly established and not novel. *See Perez v. Oakland Cnty.*, 466 F.3d 416, 424–25 (6th Cir. 2006); *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 409 (6th Cir. 2015). Moreover, Yarbrough's strange behavior and hallucinations—even without self-harm—should have alerted defendants to his need for mental-health care. *See Clark-Murphy*, 439 F.3d at 289,

291 (holding that defendants had knowledge of the risk of harm when one "learned firsthand during [her] shift that [the plaintiff] needed psychiatric care (based on seeing him pace back and forth naked in his cell and based on hearing him offer to sell her candy canes)" and another defendant "perceived symptoms of mental illness" when he "heard [the plaintiff] barking and yelling").

*Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017), which the parties cite, does not change this conclusion. There the decedent—who had a bipolar diagnosis—was acting strangely and "talking a lot of gibberish" before he was brought to jail. *Id.* at 990–91. While there, he died of an unexpected heart attack. *Id.* at 992–94. Those facts differ significantly from this case. The decedent in *Arrington-Bey* did not engage in significant self-harm and died of an unforeseeable heart attack. In contrast, Yarbrough engaged in significant self-harm due to his psychological issues. The only similarities between the two cases are that each plaintiff had psychological issues and consistently spoke nonsensically, but because their types of harm were so different, *Arrington-Bey* is easily distinguishable.

*Jail Policy*. Yarbrough contends that the jail's policy required defendants to call Pathways given his placement on a psych hold and his behavior. While relevant, a violation of an internal policy is not dispositive because "the failure [itself] to follow an internal policy does not give rise to a deliberate indifference claim." *Helphenstine*, 60 F.4th at 322. Similarly, defendants rely upon their understanding that Pathways would "not accept intoxicated inmates for a period of at least twenty-four hours." However, Yarbrough was in custody for longer than twenty-four hours and each of the defendants knew that they should at least *call* Pathways if they witnessed an inmate exhibiting behavior like Yarbrough's during his mental-health crisis.

Those policies aside, each defendant knew that Pathways was the designated mental-health provider for the jail and each defendant, except Bausman, knew that Yarbrough was on a psych

hold. Moreover, defendants admitted that an inmate's being on a psych hold signaled that it was "possible" he was suffering from mental illness, presented a suicide risk, or at least was trying to harm himself. Given these concessions and their knowledge that Yarbrough was on a psych hold, defendants were on notice that Yarbrough should have received more mental-health attention than an average inmate. *Helphenstine*, 60 F.4th at 317. Yet none of them called Pathways. In addition, even if the need to call Pathways was not obvious when Yarbrough first arrived, "[a]t a certain point, bare minimum observation ceases to be constitutionally adequate." *Greene*, 22 F.4th at 609. We conclude that a jury is best positioned to determine that point in time.

*Medical care for physical injuries.* The limited *physical* medical care Yarbrough received from Nurse Davis does not defeat Yarbrough's claim that defendants were deliberately indifferent to his *mental-health* issues. In *Greene*, a professional counselor's examination of the plaintiff was inadequate to address the plaintiff's *physical*-health needs. 22 F.4th at 608–09. The converse is true here. Nurse Davis's physical examination of Yarbrough did not address his mental-health issues, so it cannot shield defendants from liability. *See id*.; *Finley*, 723 F. App'x at 298 ("Although officials can avoid constitutional liability by addressing the inmate's serious need, they cannot escape a deliberate-indifference claim by fetching a band-aid if an inmate is hemorrhaging."); *Preyor v. City of Ferndale*, 248 F. App'x 636, 644 (6th Cir. 2007) (holding that continually bringing a detoxing inmate to the bathroom was insufficient to address his serious medical needs).

### 2.

We now turn to each defendant's individual conduct during the time Yarbrough was at the jail. *See Helphenstine*, 60 F.4th at 317. For the reasons set forth below, a reasonable juror could

conclude that each defendant acted deliberately and recklessly in the face of an unjustified risk that was either known or so obvious that it should have been known. *See id.*

*Simpson.* Simpson was directly involved with Yarbrough from the moment he arrived at the jail around 10:00 p.m. on May 15 until Simpson's shift ended at 7:00 a.m. the next morning. As the booking officer when Yarbrough was brought to the jail, Simpson knew that the transporting officers wanted to place Yarbrough in a restraint chair upon his arrival and that Yarbrough was on a psych hold. He helped place Yarbrough in the restraint chair upon his arrival, and during the process, he was there when Yarbrough tried to flee and ran into a closed door. Intentionally running into a door is not normal behavior, to say the least. Simpson also observed Yarbrough in the restraint chair and noted on the observation log that Yarbrough talked to himself, called for "Jacob," tried to hurt himself, did "[n]ot want[] to answer any questions," and tried to escape from the chair multiple times. Simpson also tried and failed to book Yarbrough because he "could not meaningfully interact with" Yarbrough, who could not answer even simple questions about his name, the current date, or who the president was. After Yarbrough's removal from the restraint chair, he did not injure himself for the rest of Simpson's shift, but he did yell from his cell and was violent and combative. Notably, although Simpson was trained to call Pathways when an inmate came in on a psych hold, he never did so for Yarbrough.

Simpson, therefore, had ample information that Yarbrough had some sort of mental-health crisis. Viewing the record in the light most favorable to Yarbrough requires us to link Yarbrough's self-harming behavior when he ran into the door upon arrival at the jail and his attempted self-harm in the restraint chair with his later self-harm in his cell. Combining that self-harm with Simpson's knowledge that Yarbrough was on a psych hold and his inability to answer simple

questions put Simpson on notice that Yarbrough was probably suffering from a serious mental-health problem. Yet he chose not to call Pathways.

*Owen*. Owen helped detain Yarbrough when he first arrived at the prison and then transported him to the hospital. He also was present when Yarbrough ran into a door upon arrival on May 15 at the jail, and he acknowledged this was an act of self-harm. A reasonable jury could find that he knew officers should call Pathways if an inmate exhibited signs of self-harm; he knew Yarbrough came to the jail on a psych hold; and he saw Yarbrough still in the observation cell—the cell specifically equipped to house inmates on a psych hold—on the morning of May 17. Yet he chose not to call Pathways.

*Eitleman*. Eitleman worked the day shift, during which she saw and heard Yarbrough repeatedly injure himself in his cell. She also observed him hallucinate—a telltale sign of a mental-health issue. Eventually, Yarbrough's conduct became concerning enough that Eitleman decided he should be restrained. Yarbrough's conduct when officers placed him in the restraint chair the second time was also quite violent: he attempted to run out of his cell, bit multiple officers as he was restrained, and ultimately had to be subdued with pepper spray. A reasonable jury could find that this conduct, combined with his being placed on a psych hold, his hallucinations, and self-harm obviously should have prompted Eitleman to seek mental-health assistance for Yarbrough. Yet she chose not to call Pathways.

*Staten*. Staten helped place Yarbrough in the restraint chair the second time. Before he was able to do so, however, Staten saw Yarbrough run into the cell door "with his head and shoulder area" more than five times. Yarbrough also bit Staten—who, as a reminder, is related to Yarbrough—when the officers opened his cell to place him in the restraint chair. Staten had never

seen Yarbrough act like this before. Staten also wrote three notes in the second restraint-chair observation log about delusional statements by Yarbrough.

At some point between the officers' placing Yarbrough in the restraint chair at 7:40 a.m. and 2:30 p.m. on May 16, Staten called Yarbrough's father. Staten told Yarbrough's father that Yarbrough had "been acting crazy," and Yarbrough's father told Staten that Yarbrough had been acting strangely for the past three weeks. Yarbrough's father also told Staten that Yarbrough was scheduled to go to Lakeside that day—on May 16. Staten told Nurse Davis and Cotton about this conversation, but he did not call Pathways to obtain mental-health treatment for Yarbrough.

After his shift ended at 6:00 p.m., Staten called Yarbrough's father again on his way home. Staten reported what happened with Yarbrough at the jail and Yarbrough's father told Staten about the circumstances of Yarbrough's coming into police custody. Staten did not relay this information to his superiors. When Staten returned to work on May 17, his only interaction with Yarbrough was to help transport him to the hospital.

In sum, Staten knew Yarbrough was on a psych hold, saw him engage in self-harm, and observed him make delusional statements. Staten also knew Yarbrough outside the jail setting and had never seen him act this way before. Through talking with Yarbrough's father, Staten also learned about Yarbrough's conduct before coming to jail, that Yarbrough's family had planned to take him to Lakeside the same day Staten helped place him in the restraint chair, and thought this information was important enough to tell Cotton and Nurse Davis. Staten had ample information to raise concerns that Yarbrough posed a risk to himself because of a mental-health issue. Yet he chose not to call Pathways.

*Stegall*. Stegall helped restrain Yarbrough, placed him in the restraint chair the second time, and knew Yarbrough was on a psych hold. Before placing Yarbrough in the restraint chair,

Stegall saw him run into the cell door and thought he was hallucinating. And after Yarbrough was in the restraint chair, Stegall was present when Nurse Davis attempted to physically examine him and saw Yarbrough get "extremely violent" when she did so.

A reasonable jury could find that Stegall saw enough concerning conduct that he should have called Pathways: he observed an inmate who he knew was on a psych hold hallucinate and engage in self-harm. And he also observed additional abnormal, violent conduct: he observed Yarbrough act violently when the officers placed him in the restraint chair and when Nurse Davis attempted to physically examine him. A jury could find that none of this was normal behavior and should have prompted Stegall to obtain mental-health assistance for Yarbrough. Yet he chose not to call Pathways.

*Cotton.* Cotton was the shift commander during the May 16 and 17 day shifts, which were from 6:00 a.m. to 6:00 p.m. Eitleman asked Cotton to help put Yarbrough in the restraint chair on May 16; before doing so, however, Cotton saw Yarbrough run into the door at least fifteen times. When the officers detained Yarbrough to place him in the restraint chair, Cotton was the one to pepper spray him. And after Staten called Yarbrough's father, he told Cotton that Yarbrough's family had arranged for him to be admitted at Lakeside on May 16. Yet she chose not to call Pathways.

*Marshall.* Marshall was the shift commander during the May 16 night shift. She knew Yarbrough was on a psych hold and, shortly after her arrival, Yarbrough began acting oddly. In the first few hours of Marshall's shift, Yarbrough yelled, engaged in self-harm, and threw food out of his cell. In fact, throughout the entirety of Marshall's shift, Yarbrough was "crying, yelling [nonsensically], and hitting the door." Yarbrough hit the door so much during Marshall's shift

that she noticed his wrist was swollen and thought it was possibly broken. Yet she chose not to call Pathways.

*Bausman.* Bausman was not at the jail while Yarbrough was detained, but she was informed about his behavior by officers at the jail.[2] Those reports informed Bausman that Yarbrough was harming himself and that he was placed in the restraint chair. Given what she was told, Bausman admitted that Yarbrough was "a threat to himself . . . as well as anybody else" at the jail. She also told Marshall to have "medical" look at Yarbrough because of injuries to his shoulder and hand; she did not think it was safe for Marshall to examine Yarbrough's injuries on her own. Yet she chose not to call Pathways.

## C.

Finally, defendants argue that, despite their alleged constitutional violations, they are entitled to qualified immunity. "Qualified immunity shields public officials from personal liability under § 1983 unless they violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Helphenstine*, 60 F.4th at 326 (internal quotation marks omitted). Once the issue is raised, a "plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). With this burden in mind, "a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (internal quotation marks omitted).

---

[2]Defendants have not argued that the special rules for supervisory liability apply to Bausman, *see Helphenstine*, 60 F.4th at 321, so our analysis is limited to Bausman in her individual capacity.

The deliberate-indifference analysis applies equally to the constitutional-deprivation question here. *See Helphenstine*, 60 F.4th at 326. As explained above, there are genuine issues of material fact as to whether defendants violated Yarbrough's constitutional rights. So we must also address whether Yarbrough's rights were clearly established.

This analysis is straightforward. It has been clearly established since at least 2002 that a prisoner has a right to not be deprived of psychological treatment. *Clark-Murphy*, 439 F.3d at 291–92 (collecting cases). Because prisoners and pretrial detainees (like Yarbrough) were treated the same for deliberate-indifference purposes until only recently, *see Brawner v. Scott Cnty.*, 14 F.4th 585, 591–97 (6th Cir. 2021), that clearly established right provides at least as much protection to pretrial detainees, *see also Richmond v. Huq*, 885 F.3d 928, 947 (6th Cir. 2018); *Bays*, 874 F.3d at 269. Moreover, "[a]s early as 1972, we stated that where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." *Greene*, 22 F.4th at 615 (internal quotation marks omitted). And it has long been clearly established that pretrial detainees have a right to be free from deliberate indifference. *Helphenstine*, 60 F.4th at 326–27. Thus, at this stage of the proceedings, defendants are not entitled to qualified immunity.

IV.

For these reasons, we affirm the district court's judgment.