NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0337n.06

Case No. 24-1929

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

FILED
Jul 11, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| RONNIE GIBSON, SR., Personal Representative for the Estate of Ronnie Gibson, Jr., | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) ) | |
| NICHOLAS ABATE, et al., | ) ) | OPINION |
| Defendants-Appellees. | ) | |

Before: SUTTON, Chief Judge; BATCHELDER and RITZ, Circuit Judges.

SUTTON, C.J., delivered the opinion of the court in which RITZ, J., concurred, and BATCHELDER, J., concurred in part. BATCHELDER, J. (pp. 9–20), delivered a separate opinion concurring in part and dissenting in part.

SUTTON, Chief Judge. While awaiting his arraignment at the Monroe County Jail in October 2020, Ronnie Gibson, Jr., killed himself. Gibson's father, as the representative of his son's estate, filed this § 1983 action against several officers and the County, claiming that they violated Gibson's due process rights by acting with deliberate indifference to the risk that he would commit suicide. The district court dismissed the complaint for failure to state a claim. We affirm.

I.

On October 1, 2020, Monroe County officers arrested Ronnie Gibson, Jr., for assault and brought him to the county jail. Later that afternoon, Officer Nicholas Abate booked Gibson into the jail. As part of that process, he asked Gibson a series of questions about his health. Gibson

said that he had attempted suicide "multiple" times, most recently by trying to hang himself at the same jail in 2019. R.16-6 at 5. He said that he was in "mental health court," had talked to a "mental health" doctor "a couple days ago," and had "just started a new psych med." R.16-6 at 5. He noted that he had recently lost a "significant" relationship and felt a "little" worthless. R.16-6 at 5. He expressed that he felt nervous "all the time" and sometimes felt hopeless and "so depressed that nothing could cheer [him] up." R.16-6 at 5. At the same time, he denied feeling "currently suicidal." R.16-6 at 5. And throughout the interview, he appeared calm and stable as he answered Officer Abate's questions.

Gibson was placed in a holding cell. A few hours later, Gibson hanged himself with the cord from the telephone mounted on the cell's wall. Officers David Uhl and Arin Dunne saw Gibson hanging in his cell about twelve minutes later and quickly removed the cord from his neck. Paramedics airlifted Gibson to a nearby hospital, where he died.

Gibson's father, the representative of Gibson's estate, sued the officers and the County under § 1983, claiming that they violated his son's due process rights under the Fourteenth Amendment. He claimed that the individual officers showed deliberate indifference to the risk that Gibson would commit suicide, and that the County allowed it all to happen. The officers and the County moved to dismiss the complaint for failure to state a claim. The district court granted their motions. This appeal followed.

## II.

Qualified immunity protects the officers from this lawsuit unless we answer yes to two questions: Did the officers violate Gibson's constitutional rights? And did the governing caselaw clearly establish the violation when it occurred? *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Because we answer no to the second question, we need not resolve the first one. *See id.* at 236.

Prison officials violate the Due Process Clause of the Fourteenth Amendment by acting with "deliberate indifference" to the serious medical needs of pretrial detainees. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243–44 (1983) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). When Gibson committed suicide, deliberate indifference meant that a prison official knew of, yet disregarded, a substantial risk of serious harm to the detainee. *See Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994); *Bays v. Montmorency County*, 874 F.3d 264, 268 (6th Cir. 2017).

That test generates a high bar in the context of prison suicides. Accounting for the reality that suicide is difficult "to predict," *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005), a constitutional duty to provide medical care applies only if the prison official knew of a "strong likelihood," not a mere "possibility," that the detainee would commit suicide, *Downard ex rel. Downard v. Martin*, 968 F.3d 594, 600–01 (6th Cir. 2020) (quotation omitted).

The officers at the Monroe County Jail did not violate any such duty to Gibson, at least under the law in place in 2020. Start with Officer Abate, who booked Gibson into the jail. While Gibson acknowledged several mental-health challenges, he denied feeling suicidal and did not act agitated or depressed at any point during the half hour that they spent together. Gibson instead appeared "calm and stable" as he answered Officer Abate's questions, often casually leaning against the counter of the officer's station while he did so. *Id.* at 601–02. The interaction simply did not suffice to give Officer Abate notice of a "strong likelihood" that Gibson would commit suicide. *See id.*; *accord Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 931 (6th Cir. 2024) (collecting pre–2020 cases).

The claims against Officers Uhl and Dunne also come up short. All that these officers knew, so far as the complaint goes, is that Gibson *had* hanged himself. Their reasonable reaction to Gibson's suicide after it happened says nothing about their knowledge before it happened.

3

The same conclusion applies to the last four officers named in the complaint: William Dobson, Katie Caswell, Collan Quinn, and Charles Galloway. They barely feature in the complaint in truth. It does not allege that they "had any interaction" with Gibson that day, let alone one that "would have alerted" them to a strong likelihood that Gibson would commit suicide. *Winkler v. Madison County*, 893 F.3d 877, 896 (6th Cir. 2018).

Gibson's father points to several allegations in the complaint as proof that the officers knew that his son would likely commit suicide. He notes that the officers knew that Gibson had previously attempted suicide, including at the same jail the year before. But Gibson's normal behavior during the booking process and his assurance that he did not feel suicidal undermined any likelihood that Gibson would attempt suicide that day. *See Downard*, 968 F.3d at 601–02; *accord Lawler*, 93 F.4th at 931.

He points out that Gibson threatened suicide several times while talking on the telephone in his cell and began pacing in his cell about ten minutes before he hanged himself. But nothing in the complaint shows, or even suggests, that the officers heard or saw any of that.

He argues that Gibson's answers during booking, which revealed his ongoing mental-health challenges, signaled to at least Officer Abate that Gibson faced a substantial risk of suicide. But in that same conversation, Gibson behaved normally, acted comfortably, and denied feeling suicidal. *See Downard*, 968 F.3d at 602; *accord Lawler*, 93 F.4th at 931.

He points out that Gibson told two officers that he did not want to go into the cell because he had just started new medications. But the complaint fails to name the two officers or even mention any such conversation. Gibson's purported reluctance to enter the cell, and his vague comment about his medication, at any event, did not signal that he was highly likely to commit suicide once inside. *See Downard*, 968 F.3d at 601.

4

He says that the officers should have put Gibson on suicide watch and in a cell without a telephone cord. But the reality that the officers could have done more with the benefit of hindsight, something they and we wish had happened, does not alter the looming reality that none of them knew of a strong likelihood that Gibson would commit suicide.

His cited cases do not fill these gaps in the claim. Two of the cases are nonprecedential, one was decided after the events of this case, and none involves a detainee who denied being suicidal and behaved normally during intake. *See LeMarbe v. Wisneski*, 266 F.3d 429, 432–33 (6th Cir. 2001); *Perez v. Oakland County*, 466 F.3d 416, 421, 425 (6th Cir. 2006); *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 485 (6th Cir. 2020); *Schultz v. Sillman*, 148 F. App'x 396, 402 (6th Cir. 2005); *Nallani v. Wayne County*, 665 F. App'x 498, 511–12 (6th Cir. 2016).

He claims that we should be wary of dismissing a case under Civil Rule 12(b)(6) based on the clearly established prong of qualified immunity. "Absent any factual development beyond the allegations in a complaint," it is true, we may struggle to "determin[e] whether the facts of this case parallel a prior decision or not." *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring). But this is "a general preference, not an absolute one." *Siefert v. Hamilton County*, 951 F.3d 753, 761 (6th Cir. 2020) (quotation omitted). When a complaint fails to allege a clearly established violation "on its face," it will "not often survive a motion to dismiss on qualified immunity grounds." *Crawford v. Tilley*, 15 F.4th 752, 766 (6th Cir. 2021). That is what we have here.

The partial dissent believes a different test applies to the state of mind of the defendants. In 2020, recall, we used an actual-knowledge standard to deal with deliberate-indifference claims. *See Bays*, 874 F.3d at 268. But in a series of decisions between 2021 and 2023, we lowered

the bar to require only recklessness. *See Brawner v. Scott County*, 14 F.4th 585, 596–97 (6th Cir. 2021); *Trozzi v. Lake County*, 29 F.4th 745, 757–58 (6th Cir. 2022); *Helphenstine v. Lewis County*, 60 F.4th 305, 316–17 (6th Cir. 2023) (resolving a conflict between *Brawner* and *Trozzi* in favor of the former, because *Brawner* was decided first). This standard governs conduct that occurred after 2021. The partial dissent responds that, in *Helphenstine*, we erroneously treated this new test as clearly established for conduct as early as 2017. *See* 60 F.4th at 326–27.

We read *Helphenstine* differently. There, we answered both questions raised by the officers' qualified-immunity defense: Did the officers violate the Constitution? And did the caselaw clearly establish the violation when it occurred? In resolving the first question, we asked whether the officers violated the law as it was at the time of the lawsuit in 2023—that is, whether the officers recklessly disregarded the detainee's serious medical needs. *Id.* at 315–22. In resolving the second question, we asked whether the officers violated the clearly established law as it was at the time of their conduct in 2017—that is, whether they consciously disregarded the detainee's serious medical needs. *Id.* at 326–27. Only by answering yes to both questions, as *Helphenstine* did, could we deny some of the officers qualified immunity. *Id.* at 327.

Three features of *Helphenstine* confirm this reading and confirm that it did not change the clearly established test. The first is that *Helphenstine* said it applied the law at the time of the officers' conduct in 2017. It "look[ed] to see how clearly the right to be free from deliberate indifference was established at the time [the detainee] died in 2017" and identified as "clearly established" the detainee's right to receive care for his "known, serious medical needs." *Id.* (quotation omitted). The second feature is that it relied on cases that required knowledge, not recklessness. *See id.*; *see also Greene v. Crawford County*, 22 F.4th 593, 615 (6th Cir. 2022) (treating as clearly established that officers must not disregard a detainee's "known, serious

medical need[]" (quotation omitted)); *Smith v. County of Lenawee*, 505 F. App'x 526, 532 (6th Cir. 2012). The third feature is that it denied the officers qualified immunity after describing how each of them knew of the detainee's serious medical needs. *See Helphenstine*, 60 F.4th at 318 ("Riley . . . recognized that [the detainee']s condition was serious enough that he needed medical attention[.]"); *id.* at 319 ("Despite [McGinnis's] personal observation and knowledge, she did not seek medical attention for him."); *id.* ("Ruark knew that [the detainee] was in withdrawal and observed him vomiting," and he "saw [the detainee] lying face down[.]"); *id.* at 320 ("Bloomfield knew [the detainee] was . . . 'dope sick,'" "knew he was going through withdrawal," "was aware that he had diarrhea," and "saw [him] lie face-down[.]"); *id.* ("[The jury] could also reasonably conclude that Lykins knew [the detainee's] condition needed hospital care."); *id.* at 322 ("Dr. von Luhrte knew that [the detainee] was in distress and knew that he needed treatment that only a hospital could provide.").

That takes us back to this case. The law in 2020 required that the officers know of a strong likelihood that Gibson would commit suicide. *See Bays*, 874 F.3d at 268. And this complaint did not plausibly plead that the officers knew of such a risk. All of the officers as a result are entitled to qualified immunity.

### III.

Gibson's father claims that the County failed to train officers to prevent suicides and failed to treat suicidal detainees properly. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). To hold the County responsible on either front, Gibson's father must prove as an initial matter that the County's failures amounted to a policy of deliberate indifference to Gibson's constitutional rights. *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994 (6th Cir. 2017). But a County "cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional

right when that right has not yet been clearly established." *Id.* (quotation omitted). Gibson's Fourteenth Amendment right was not clearly established for the reasons we have already given. That ends his *Monell* claim.

We affirm.

**ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part.**

I agree with the majority opinion that Officers Uhl, Dunne, Dobson, Caswell, Quinn, and Galloway are entitled to qualified immunity because no matter which standard that we apply here, those officers did not violate Gibson, Jr.'s clearly established constitutional rights. But I disagree that Officer Abate is entitled to qualified immunity at this stage because I believe that the complaint plausibly pled that he did violate Gibson, Jr.'s clearly established rights under the deliberate-indifference standard that should apply to his claims.

I also write separately to explain that the state of this circuit's deliberate indifference law has become both deeply flawed and painfully convoluted. Indeed, even though Supreme Court precedent makes clear that the Fourteenth Amendment did not establish a federal tort code that exists to compensate pretrial detainees for jailhouse negligence, recent decisions from this court have interpreted the Fourteenth Amendment to do exactly that. *See Brawner v. Scott County*, 14 F.4th 585, 596 (6th Cir. 2021) (modifying the subjective component of this court's two-part deliberate indifference test); *Helphenstine v. Lewis County*, 60 F.4th 305, 316 (6th Cir. 2023) (eliminating that same subjective component).

Nor do the problems with this court's deliberate-indifference jurisprudence end there. Because even if we ignore how *Helphenstine*'s interpretation lacks any support in the Fourteenth Amendment's text, history, or precedent, there exists yet another and even more fundamental problem with *Helphenstine*'s holding, which is that it also violated another line of Supreme Court precedent when it gave retroactive effect to its novel rule and then denied qualified immunity on that basis. As a result of that decision, we must now hold government officials liable for violating rules that did not even exist at the time that their challenged conduct occurred.

Aside from being wrong, our deliberate-indifference jurisprudence also, in my view, makes no sense. Indeed, the reckless-disregard standard that *Brawner* and *Helphenstine* created is "far from clear," *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022), which is presumably why subsequent panels of this court disagree on how to apply it, *compare, e.g.*, *Britt v. Hamilton County*, No. 21-3424, 2022 WL 405847, at *2-6 (6th Cir. Feb. 10, 2022) (applying *Brawner*'s reckless-disregard standard), *with id.* at *7 (Clay, J., dissenting) (disagreeing with the majority's application of *Brawner*); *compare also Helphenstine*, 60 F.4th at 316 (foreclosing any inquiry into the officer's subjective understanding), *with Coleman v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 130 F.4th 593, 599 (6th Cir. 2025) (explaining that this court now uses "a less demanding" subjective inquiry), *and Lawler v. Hardeman County*, 93 F.4th 919, 927-28 (6th Cir. 2024) (declining to apply *Helphenstine* altogether). And these disagreements have also, unsurprisingly, left the district courts in our circuit unsure about what our precedent requires them to do in these deliberate-indifference cases. *See, e.g.*, *Campbell v. Riahi*, No. 20-cv-678, 2023 WL 5979211, at *4 (S.D. Ohio Sep. 13, 2023) (acknowledging that "there's a bit of a problem in analyzing such claims" in the Sixth Circuit and explaining that "[a]bsent clarification, the safest course is perhaps to analyze such claims under both standards, with fingers crossed that [the Sixth Circuit] agree[s].").

At the end of the day, at least one thing has become abundantly clear: the status quo cannot continue. And rather than wait for the Supreme Court to fix our own mistakes for us, the en banc court must put an end to the chaos and confusion spawned by *Brawner*, *Helphenstine*, and their progeny.

## I.

To start, *Brawner* was wrongly decided. *See Brawner*, 14 F.4th at 605-611 (Readler, J., concurring in part and dissenting in part). The Fourteenth Amendment's Due Process Clause,

which provides that no state shall "deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, does not protect pretrial detainees from negligent jailhouse officials, *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) (explaining that "accident[al]" pain caused by the "inadvertent failure to provide adequate medical care" does not violate the Constitution). Rather, with regard to pretrial detainees, the Due Process Clause ensures only that such detainees are not punished unless and until they have first been properly convicted of a crime. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). And so, given this more limited purpose, the "proper inquiry" for evaluating the conditions of confinement for pretrial detainees under the Fourteenth Amendment is "whether those conditions amount to [a] punishment"—not whether those conditions resulted from government negligence. *Id.*

To determine whether conditions of confinement amount to a punishment, courts have long borrowed principles from the Eighth Amendment, reasoning that if a government official's conduct would constitute a cruel and unusual punishment under the Eighth Amendment, then it must surely also violate the Fourteenth Amendment's prohibition against punishing pretrial detainees at all. *See, e.g.*, *Roberts v. City of Troy*, 773 F.2d 720, 722-23 (6th Cir. 1985). And under the Eighth Amendment's Cruel and Unusual Punishments Clause, the Supreme Court has recognized that the Constitution prohibits the "unnecessary and wanton infliction of pain" that is caused by the deliberate withholding of treatment for a serious medical need. *Estelle*, 429 U.S. at 103-05.

Until recently, a plaintiff had to establish two things to prove that a jail official acted with deliberate indifference to his medical needs. First, the plaintiff had to show that he had a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). And second, the plaintiff also had to show that the "official kn[ew] of and disregard[ed] an excessive risk . . . to health or safety." *Id.* at 837. Because the Eighth and Fourteenth Amendments are violated only

11

when a government official is *deliberately* indifferent to a prisoner's medical needs, this second prong's subjective inquiry played a crucial role in deciding these claims: it "isolate[d] those [government officials] who inflict[ed] punishment" within the meanings of these Amendments. *Id.* at 839.

In 2015, however, the Supreme Court decided *Kingsley v. Hendrickson* and eliminated the subjective inquiry in the two-part test for excessive force claims. 576 U.S. 389, 397-98 (2015). And even though *Kingsley* did not involve deliberate-indifference claims, our court, not long after *Kingsley* was decided, chose to extend this same approach to such claims and to modify the subjective inquiry for deciding them. *Brawner*, 14 F.4th at 596. In *Brawner*'s view, *Kingsley* requires plaintiffs to "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

But *Kingsley* required no such sea change in our well-settled jurisprudence on this issue. *See Brawner v. Scott County*, 18 F.4th 551, 551-53 (6th Cir. 2021) (*Brawner II*) (Readler, J., dissenting from the denial of rehearing en banc). Rather, *Kingsley* simply held that excessive-force claims do not require a separate subjective inquiry to prove an official's intent to punish because the intentional use of an objectively unreasonable amount of force can never be "rationally related to a legitimate *nonpunitive* government purpose." 576 U.S. at 398 (emphasis added). Because the same cannot be said about deliberate-indifference claims—which involve not intentional affirmative acts but instead failures to act—*Kingsley*'s reasoning simply does not apply to these kinds of claims. *See, e.g.*, *Castro v. County of Los Angeles*, 833 F.3d 1060, 1086 (9th Cir. 2016) (en banc) (Ikuta, J., dissenting) ("While punitive intent may be inferred from affirmative acts that are excessive in relationship to a legitimate government objective, the mere failure to act does not raise the same inference.").

12

Besides, even if some of *Kingsley*'s reasoning about excessive force claims could apply to deliberate indifference claims, *Brawner* was still not justified in using it "to jettison our traditional inquiry in the deliberate indifference setting." *Brawner II*, 18 F.4th at 552 (Readler, J., dissenting from the denial of rehearing en banc). That is because, as explained above, this court's prior, longstanding approach came directly from the Supreme Court's decision in *Farmer*, and the Supreme Court has commanded that circuit courts may not disregard a Supreme Court precedent with "direct application in a case" simply because that precedent "appears to rest on reasons rejected in some other line of decisions." *E.g.*, *Tenet v. Doe*, 544 U.S. 1, 10-11 (2005) (reversing a circuit court for refusing to follow Supreme Court precedent that the circuit court believed to be abrogated by other Supreme Court decisions). Rather, until the Supreme Court says otherwise, the circuit courts must continue to apply that prior precedent and "leav[e]" to the Supreme Court "the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). And these principles apply with special force here given that *Kingsley* itself expressly disavowed having any application beyond the excessive-force context. *Kingsley*, 576 U.S. at 396 (explaining that the question before the Court "concern[ed] the defendant's state of mind with respect to whether his use of force was 'excessive'" and concluding that it was "with respect to that question that the relevant standard is objective not subjective"); *see also Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020) (recognizing the narrow question presented in *Kingsley*); *Dang ex rel. Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (same).

## II.

Nor do the problems with this court's deliberate-indifference jurisprudence end with *Brawner*. That is because *Helphenstine*, for its part, compounded *Brawner*'s mistake with three

of its own: (1) it disregarded binding circuit precedent, (2) it violated Supreme Court precedent by adopting a de facto negligence standard for deliberate-indifference claims, and (3) it violated Supreme Court precedent by giving retroactive effect to its novel rule to deny qualified immunity on that basis.

**A.**

First, *Helphenstine* disregarded *Trozzi v. Lake County*, 29 F.4th 745 (6th Cir. 2022), which was binding circuit precedent. Given that *Brawner*'s new standard of "something akin to reckless disregard" was "far from clear," *Hyman*, 27 F.4th at 1237, *Trozzi* tried to clarify what *Brawner* required. And after engaging in a detailed exploration of *Brawner*'s analysis, *Trozzi* held that *Brawner*'s reckless-disregard standard required a plaintiff to satisfy three elements to prevail on his deliberate indifference claim: (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer would have understood the plaintiff's medical needs, if untreated, presented an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the plaintiff, yet he ignored that risk. *Trozzi*, 29 F.4th at 757-58.

But despite *Trozzi*'s attempt to apply *Brawner* faithfully, *Helphenstine* refused to follow it. It refused to do so because, at least according to the panel there, *Trozzi* had reached a result "irreconcilable with *Brawner*." 60 F.4th at 316-17. And so, based on that conclusion, the *Helphenstine* panel invoked this court's prior-panel rule and claimed the power to nullify *Trozzi*'s holding. *Id.* The panel did so even though the en banc court saw no reason to correct *Trozzi* and denied the petition for rehearing there. *See Trozzi v. Lake County*, No. 21-3685, 2022 WL 2914589, at *1 (6th Cir. July 12, 2022) (order).

The prior-panel rule applies only when there exist two published decisions of this court that reach contradictory results—not when one panel believes that another panel incorrectly

14

interpreted circuit precedent on a particular issue. *See, e.g.*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014) (noting that a subsequent case's "qualifi[cation]" of "overly broad language" and "clarification of the standard" from a previous case does not violate the prior-panel rule). Indeed, if the prior-panel rule allowed a panel to nullify any decision that it believed had incorrectly interpreted circuit precedent, horizontal stare decisis would be little more than a mirage. *See Hulon v. City of Lansing*, No. 23-1937, 2025 WL 817492, at *5 (6th Cir. Mar. 14, 2025) (Readler, J., concurring). Nor, for that matter, would this court have any need for en banc review, which exists precisely to correct a panel's erroneous interpretation or application of circuit precedent. *See, e.g.*, *Rutherford v. Columbia Gas*, 575 F.3d 616, 625 (6th Cir. 2009) (Clay, J., concurring in part and dissenting in part) ("[I]t makes sense to construe reported panel decisions as 'binding' on subsequent panels only because en banc reconsideration always is available to correct panel mistakes.").

**B.**

Second, *Helphenstine* also conflicts with *Brawner*. Indeed, rather than reaffirm *Brawner*'s reckless-disregard standard—which, according to *Brawner* itself, only modified the subjective prong—*Helphenstine* went one step further and eliminated the subjective inquiry altogether. *See Helphenstine*, 60 F.4th at 316 (holding that any "framing of the elements" that includes a subjective inquiry "is irreconcilable with *Brawner*").

But that cannot be right because a recklessness standard without a subjective inquiry is just a gross-negligence standard. *See* Restatement (Second) of Torts § 500 (Am. L. Inst. 1965) (defining recklessness as "conduct [that] creates an unreasonable risk of physical harm" to a degree "substantially greater than that which is necessary to make [the] conduct negligent"). And if the difference between negligence and gross negligence is simply the degree of risk involved, then it

is impossible to see how those two standards are not one and the same in the jail context, given that jails often "house society's most antisocial and violent people in close proximity with one another," which makes them "necessarily dangerous places." *Farmer*, 511 U.S. at 859-60 (Thomas, J., concurring in the judgment). In other words, because the degree of "risk [in jails] is already elevated" compared to the outside world, *Helphenstine*'s deliberate-indifference standard is essentially nothing more than a negligence standard masquerading as a recklessness standard. *See Westmoreland v. Butler County*, 29 F.4th 721, 735 (6th Cir. 2022) (Bush, J., dissenting) (explaining that the reckless-disregard standard "collapses into de facto negligence"). But that standard cannot be squared with Supreme Court precedent, which has made clear that "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *Kingsely*, 576 U.S. at 396 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)); *see also Brawner*, 14 F.4th at 596 (recognizing that "negligence is insufficient").

## C.

Finally, *Helphenstine* also botched how qualified immunity works. The Supreme Court has said time and again that a constitutional rule is not clearly established unless the "rule's *contours* [are] so well defined that it is clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (explaining that a government official's conduct violates clearly established law only when, "at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right" (alterations in original)); *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (same); *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (explaining that "a defendant cannot be said to have violated a clearly established right unless the

16

right's contours were sufficiently definite"); *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (same); *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999) (explaining that "[c]learly established for purposes of qualified immunity means that the contours of the right must be sufficiently clear " (cleaned up)); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (same). And the contours of a clearly established rule necessarily include the applicable legal standard used to decide whether the plaintiff's right was violated. *Wesby*, 583 U.S. at 63 (explaining that the "legal principle must have a sufficiently clear foundation in then-existing precedent"); *see also City of Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (reversing a circuit court for defining the "clearly established right at a high level of generality by saying only that the 'right to be free of excessive force' was clearly established"). Yet *Hephenstine* ignored this clear command and held that its novel recklessness standard was clearly established because the right to be free from deliberate indifference has been recognized "since 1972" and because this court "reiterated in 2013 that it is clearly established that a prisoner has a right not to have his known, serious medical needs disregarded by a medical provider or an officer." *Helphenstine*, 60 F.4th at 327 (citing *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972)); *see also Hulon*, 2025 WL 817492 at *3 (explaining how *Helphenstine* misapplied qualified immunity).

Despite *Helphenstine*'s clear language, the majority opinion now reads *Helphenstine* differently. In its view, *Helphenstine* analyzed the qualified immunity issue correctly because it (1) considered "whether the officers violated the law as it was at the time of the lawsuit in 2023" (by recklessly disregarding the detainee's serious medical needs) and (2) considered "whether the officers violated the clearly established law as it was at the time of their conduct in 2017" (by consciously disregarding the detainee's serious medical needs). **Maj. Op. 6.** And because the

majority opinion believes that the *Helphenstine* panel answered "yes" to each question, it upholds and defends *Helphenstine*'s qualified immunity analysis.

I cannot read *Helphenstine* this way because it is beyond question that the panel there did not do these things. To start, if the *Helphenstine* panel truly decided that the government officials there had violated the clearly established law from 2017, then it is inexplicable why the panel devoted most of its opinion to analyzing whether those same officials violated the law as it stood in 2023. *See Helphenstine*, 60 F.4th at 317-326 (analyzing this issue over nine pages of the federal reporter). After all, qualified immunity is not available to a government official who "(1) violated a constitutional right that (2) was clearly established when the conduct occurred"—regardless of whether that same conduct would also violate the law six years later. *See, e.g.*, *Fitzpatrick v. Hanney*, 138 F.4th 991, 995 (6th Cir. 2025). And so that means, in other words, that if the majority opinion is correct, then the *Helphenstine* panel apparently chose the unorthodox approach of using nine of its seventeen pages to discuss mere dicta while using only three paragraphs to address the actual holding. Our opinion in *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919 (6th Cir. 2024), only proves how anomalous *Helphenstine* is under the majority opinion's view of it. There, this court expressly declined to decide whether the government officials violated today's legal rules and instead considered only whether those officials violated the clearly established law at the time of their challenged conduct. *See id.* at 925 ("We need not (and do not) decide whether the Officers violated today's legal rules because [the plaintiff] has not shown that they violated the rules in place when Lawler committed suicide.").

But even setting aside the *Helphenstine* panel's curious approach, there can be no doubt that the *Helphenstine* panel did not analyze the qualified immunity issue in the way that the majority opinion suggests for at least one of the government officials there, Sandy Bloomfield.

18

Indeed, even though Bloomfield expressly argued that she could not have been deliberately indifferent to the detainee's medical needs because she did not have the actual knowledge required by this court's precedent at the time of her conduct, the *Helphenstine* panel still denied her qualified immunity:

> To avoid this conclusion [that she was deliberately indifferent to the detainee's medical needs], Bloomfield argues that she believed Helphenstine was, at various times, "coherent," responsive, and improving. Thus, she argues, she did not *know* of any risk, so she could not disregard that risk and she is not liable. *But these observations are of no moment when we apply Brawner*. Although Bloomfield observed Helphenstine's condition fluctuate, the record demonstrates that she should have known that he was urgently in need of medical care—at the very least, when she observed Helphenstine unmoving and unable to lift his own head to drink, she *should* have recognized a serious need for medical care. Reckless inaction in the face of that obvious need is enough to proceed to a jury under *Brawner*. The district court erred in concluding otherwise.

*Helphenstine*, 60 F.4th at 320 (second emphasis added).

And when it later came time to decide whether Bloomfield had violated the detainee's clearly established constitutional rights, the *Helphenstine* panel did not decide whether Bloomfield had "consciously disregarded the detainee's serious medical needs." **Maj. Op. 6.** Rather, after laying out the applicable legal principles, *Helphenstine* used just four sentences to analyze whether ten defendants were entitled to qualified immunity, and none of those sentences mentioned whether Bloomfield (or any other defendant, for that matter) had the subjective knowledge required by our precedent:

> Just like in *Greene v. Crawford County*, Helphenstine experienced a dangerous medical condition for at least a day before his death. The Lewis County defendants did not provide any medical assistance during that time beyond two doses of antiemetics. Helphenstine's right not to have serious medical needs disregarded by the Lewis County defendants was clearly established in this scenario. Accordingly, none of the remaining Lewis County defendants are entitled to qualified immunity.

*Helphenstine*, 60 F.4th at 327.

19

Finally, even if the *Helphenstine* panel did cite cases that required actual knowledge, it still would not save its flawed analysis because citing the right cases is only half of the equation.[1] What matters just as much (if not more) is the analysis that follows. And because the analysis in *Helphenstine* ultimately led the panel there to deny qualified immunity to a government official who did not have the actual knowledge required by our precedent at the time of her conduct, I cannot agree with the majority opinion's understanding of *Helphenstine*.

**III.**

In sum, this court's deliberate-indifference jurisprudence simply no longer reflects the Fourteenth Amendment's text and history, and the en banc court should fix these mistakes.

---

[1] It is dubious whether *Helphenstine* cited cases that required actual knowledge. For example, in *Greene v. Crawford County*—which is the case that *Helphenstine* relied on most—the qualified-immunity analysis is nearly identical to *Helphenstine*'s and thus appears to suffer from the same flaws. *See* 22 F.4th 593, 614-15 (6th Cir. 2022).